COURT OF APPEALS OF VIRGINIA


Present:  Judges Coleman, Koontz and Senior Judge Hodges


KATHRYN S. NEWCOMB

v.        Record No. 0636-94-3

PAUL W. NEWCOMB
                                    MEMORANDUM OPINION*
AND                         BY JUDGE SAM W. COLEMAN III
                                      JULY 25, 1995
PAUL W. NEWCOMB

v.        Record No. 1195-94-3

KATHRYN S. NEWCOMB


            FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
                    George E. Honts, III, Judge

            Ellen M. Arthur (McClung & Arthur, on
            briefs), for Kathryn S. Newcomb.

            J. Lloyd Snook, III (Snook & Haughey, P.C.,
            on briefs), for Paul W. Newcomb.


        Paul Newcomb and Kathryn Newcomb appeal from an order in

which the circuit court determined that the amount Paul Newcomb

is to pay Kathryn Newcomb "in lieu of alimony" in accordance with

the terms of their court approved property settlement agreement

is $14,000.  Both parties contend that the circuit court's

computation of the amount owed, which was computed from a

mathematical formula contained in the property settlement

agreement, was incorrect.  We hold that because the trial court

correctly determined the "gross sale price" of Paul Newcomb's

---

        * Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

interest in their bed and breakfast property, which amount is the contested and controlling component of the formula, the court did not err in computing the amount to which Kathryn Newcomb is entitled.  Therefore, we affirm the trial court's judgment order awarding her $14,000 "in lieu of alimony."

FACTS

In 1991, the Circuit Court of Rockbridge County entered an agreed divorce decree, incorporating the Newcombs' property settlement agreement.  The agreement and decree ordered that Paul Newcomb pay Kathryn Newcomb $100,000 in consideration for certain of her property interests and Kathryn Newcomb was ordered to convey "all her right, title, and interest" in their real property, which included a bed and breakfast inn, and listed personal property.  The decree also specifically provided that Kathryn Newcomb would convey her interest in the inn "according to Paul Newcomb's right to "assign . . . or convey [Kathryn's] interest to a partner."

The provision of the agreement that creates the controversy in this case states:

> "In lieu of alimony, [Paul] will pay to
> Kathryn according to the following schedule:
>    Should [Paul] sell, transfer or dispose of
> the one-half interest he currently holds
> . . . at any time within fifteen years of the
> date of this order he shall pay to [Kathryn]
> the amount determined as follows:
>    "<u>If within five years hereof, 20 percent
> of the difference between the gross sale
> price of [Paul's] interest in the said
> property and $250,000.00.</u>"

(Emphasis added).

In order to obtain funds to pay Kathryn Newcomb $100,000 as per the agreement, Paul Newcomb borrowed $150,000 from Philip Clayton. Paul used the remaining $50,000 to pay debts. At Paul Newcomb's direction, and in accordance with the terms of their agreement, Kathryn conveyed her undivided one-half interest in the bed and breakfast property to Philip Clayton, Paul Newcomb's assignee, by deed dated December 20, 1991.

On July 6, 1993, Paul Newcomb and Philip Clayton entered into a Lease Purchase Agreement in which Clayton agreed to purchase the bed and breakfast property for $411,900, "payable in cash upon closing," and the assumption of an outstanding $186,000 indebtedness. Clayton also agreed to pay Paul Newcomb an additional $58,100 for the furnishings and personalty in the inn. Thus, on the face of the Lease Purchase Agreement it appeared that Clayton was paying Paul Newcomb $470,000 in cash consideration for the entire property plus the assumption of indebtedness, even though Clayton already owned a one-half undivided interest in the property, which he had acquired by deed from Kathryn Newcomb.

On November 22, 1993, Paul Newcomb and Philip Clayton entered into an Amended Lease Purchase Agreement, because the "June, 1993 [agreement] did not clearly set forth the terms of the payments and the total purchase price for the property." In the amended agreement Clayton agreed to purchase "Paul W.

Newcomb's interest" in the inn for $411,900 "less the sum of
. . . $150,000 . . . which amount has previously been paid when
the purchaser herein purchased the undivided one-half (1/2)
interest of Kathryn S. Newcomb." The amended agreement further
provided that Clayton was to pay Paul Newcomb $58,100 for the
furnishings, personalty, bank deposits in the business account,
and the assumption of certain debt. In addition to the Lease
Purchase and Amended Lease Purchase Agreements setting forth the
terms of the sale, a statement submitted in support of Philip
Clayton's application for a federal Housing and Urban Development
(HUD) loan showed the total purchase price for the realty to be
$411,900, and the purchase price for the personalty to be
$58,100. The HUD draft closing statement showed $150,000 as a
"credit" to Clayton against the total purchase price "for the
previous purchase of one-half interest in mill."

### TRIAL COURT RULING

The dispositive question before the trial court, and before
this Court, is the amount of the "gross sale price" paid by
Philip Clayton for "Paul W. Newcomb's interest in the property."
Kathryn Newcomb argues that according to the July, 1993 Lease
Purchase Agreement, the gross sale price of Paul Newcomb's
interest in the property was $461,900, and, thus, after deducting
$250,000 according to the terms of the agreement, she was
entitled to 20 percent of the difference, or $42,380.[1]  Paul

---

[1]  In footnote 8 on p.5 of Appellant Kathryn Newcomb's brief
she computes the amount she claims to be due at $43,820, but it

-4-

Newcomb argues, on the other hand, that Kathryn Newcomb is entitled to nothing "in lieu of alimony" because, according to his computation, in which he deducts the amounts owing against the property for deeds of trusts and other liens, the gross sale price of Paul Newcomb's interest in the property is $125,900. Therefore, after deducting $250,000, nothing remains from which Kathryn is to be paid 20 percent.

The trial judge determined, based upon the terms of the Amended Lease Purchase Agreement, that $470,000 was the stated total gross purchase price that Clayton would be paying for both Paul's and Kathryn's interests in the realty and the furnishings and personalty associated with the inn. The trial court found, relying upon the terms of the Amended Lease Purchase Agreement, that the "gross sale price" which Philip Clayton paid for "Paul W. Newcomb's interest in the property" was the total gross sale price of $470,000, less the amount of $150,000 that Clayton had loaned to Paul Newcomb, and which indebtedness was forgiven as consideration for Paul's assigning Kathryn's interest in the property to Clayton. Thus, by applying the formula from the property settlement agreement for determining the amount to be paid Kathryn Newcomb "in lieu of alimony" to the "gross sale price" for "Paul W. Newcomb's interest in the property," as determined from the Amended Lease Purchase Agreement, the trial

appears that she based this computation on "a gross total sales price for the Inn" by transposing figures and using the figure $469,100, rather than $461,900.

court determined that the gross sale price for Paul Newcomb's one-half undivided interest in the inn, including furnishings and personalty, was $320,000, of which, after deducting $250,000, Kathryn Newcomb was entitled to 20 percent of the balance, or $14,000.[2]

## ANALYSIS
### PROPERTY SETTLEMENT AGREEMENTS

Property settlement agreements are subject to the same rules of interpretation as are other contracts. Smith v. Smith, 15 Va. App. 371, 374, 423 S.E.2d 851, 853 (1992); Tiffany v. Tiffany, 1 Va. App. 11, 15, 332 S.E.2d 796, 799 (1985). In construing the terms of a property settlement agreement, just as in construing the terms of any contract, we are not bound by the trial court's conclusions as to the construction of the disputed provisions. Smith v. Smith, 3 Va. App. 452, 455, 350 S.E.2d 526, 528 (1986) (citations omitted). "If all the evidence necessary to construe a contract was presented to the trial court . . . the meaning and effect of the contract is a question of law which can be readily ascertained by this Court." Fay v. Schwarting, 4 Va. App. 173, 180, 355 S.E.2d 342, 346 (1987) (citing Wilson v. Holyfield, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984)). When examining the instrument, we discern the intent of the parties and the meaning of the language from the examination of the entire document, giving full effect to the words actually used. Layne v.

---

[2] $20\% \times (470{,}000 - 150{,}000 - 250{,}000) = 14{,}000$

<u>Henderson</u>, 232 Va. 332, 337-38, 351 S.E.2d 18, 22 (1986).

The Newcombs' property settlement agreement provides that the amount to be paid to Kathryn Newcomb in lieu of alimony shall be based upon the gross sale price of Paul Newcomb's "one-half interest he currently holds" in the inn and furnishings when he sells the property. Thus, at the time the property settlement was executed, the determination of the amount to be paid in lieu of alimony was contingent upon a future event, which was the sale of the property.

While we are not bound by the trial court's construction of the terms of a contract, the meaning and terms of the provision for determining the amount in lieu of alimony are beyond dispute. The meaning of the term gross sale price, despite the contentions on brief of Paul Newcomb to the contrary, is clear and unambiguous. Gross sale price means the total price paid for an item without reduction for indebtedness, fees, expenses, or costs associated with the sale.

The parties' dispute over the sale price of Paul Newcomb's interest derives not from any ambiguity in the terms of the contract or the meaning of the term gross sale price. Rather, the problem arises from the fact that under the agreement the determination of the amount due Kathryn Newcomb depends upon a future sale where the sale amount is controlled by Paul Newcomb. Moreover, the sale ultimately involved a complex financial transaction between Paul Newcomb and Philip Clayton, where the

terms were defined by two lease purchase agreements which obscured the amount of the gross sale price that Paul Newcomb received.

The amount of the gross sale price that Paul Newcomb received is a fact that the trial court was required to determine based upon the terms of the transaction between Paul Newcomb and Philip Clayton. We are bound by the trial court's factual determination of the amount of the gross sale price if it was supported by credible evidence. See Ferguson v. Stafford County Dep't of Social Servs., 14 Va. App. 333, 336, 417 S.E.2d 1, 2 (1992).

Kathryn Newcomb contends that the evidence on which the trial court should have based its finding of gross sale price for Paul Newcomb's interest was the amount of the purchase price stated in the first Lease Purchase Agreement or $461,900, without considering the terms of the Amended Lease Purchase Agreement or the amounts stated in the HUD applications and closing statements, which documents show that the amounts in the first agreement were erroneous and the base amount pertained to the total purchase price that Clayton was to pay, including the amount for Kathryn's interest. On the other hand, Paul Newcomb argues, in effect, that the trial court should have based its finding of the amount of the gross sale price of his interest upon one-half of the stated total amount that Clayton was paying for the property, despite the fact that Paul Newcomb was, in

fact, receiving considerably more than that amount from Clayton for his one-half undivided interest.

The trial court, in making a factual determination of the gross amount that Paul Newcomb was paid for his interest in the property, was required to consider all relevant and material evidence which showed the terms of the transaction. By accepting the terms of the Amended Lease Purchase Agreement and the HUD documents, the trial court necessarily found that the terms of the Lease Purchase Agreement did not accurately define the terms of the sale. The Amended Lease Purchase Agreement and the HUD application and closing statements support the trial court's finding that $470,000 was the total gross sale price that Philip Clayton was paying for the entire property. Thus, in order to determine the gross sale price of Paul Newcomb's undivided interest, the trial court had to determine the value of the other share. In doing so, it had before it evidence that Kathryn Newcomb received $100,000 for conveying her interest in the marital property to Paul Newcomb and evidence that Philip Clayton had forgiven a $150,000 loan to Paul Newcomb in order to have Paul assign to Clayton Kathryn Newcomb's interest in the inn. Kathryn Newcomb knew at the time that she entered into the property settlement agreement that she would be paid $100,000 for her interest in the marital property and the balance of $50,000 that Paul Newcomb borrowed from Clayton would be used to defray their joint indebtedness. Thus, because Kathryn Newcomb was a

party to the transaction, and because she knew and understood that $100,000 of the loan was to be paid her and the $50,000 balance was to be used partially for her benefit to pay joint debts, the trial court did not err in finding that $150,000 was the amount of the purchase price paid for the assignment of Kathryn Newcomb's interest in the inn and furnishings and that $320,000 was the gross sale price paid for Paul Newcomb's interest.

Accordingly, the evidence supports the trial court's finding that the gross sale price paid for Paul Newcomb's undivided one-half interest in the property was $320,000. We, therefore, affirm the judgment of the trial court.

Affirmed.